# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

MICHAEL GLOVER,

          Plaintiff,


       -vs-                            Case No.   05-C-869

CAPTAIN STEVEN HAFERMAN, BILL MCCREEDY,
MATTHEW J. FRANK, JAMES GREER,
MICHAEL DITTMANN, DAVID TARR,
TIMOTHY IMMEL, DR. ELSA HORN,
DEBRA PALM, WARDEN LARRY JENKINS,
HAYLEY PUCKER f/k/a HAYLEY HERMANN,
and SERGEANT SCOTT JABER,

          Defendants.

---

# DECISION AND ORDER

---

       Plaintiff Michael Glover, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding *in forma pauperis* on an Eighth Amendment medical care claim and retaliation claims. The defendants have filed a motion for summary judgment which will be addressed herein.

       The plaintiff is proceeding on the following claims. First, the plaintiff alleges that he was transferred from Unit 10 to Unit 7 in violation of a medical restriction. According to the complaint, on January 5, 2005, defendant Palm signed a medical restriction requiring the plaintiff to be housed in a unit close to the Health Services Unit because he was

at risk of a heart attack due to hepatitis-C treatment medication he was taking. However, on April 28, 2005, the plaintiff was transferred from Unit 10, which is close to the Health Services Unit, to Unit 7, which is far from the Health Services Unit, in retaliation for filing an inmate complaint against defendant Sergeant Jaber. The plaintiff alleges that he feared for his medical safety after the transfer and therefore he abruptly stopped taking his hepatitis-C medication, which caused him to become severely ill.

Second, the complaint alleges that defendants Immel and Tarr wrote the plaintiff bogus conduct reports in retaliation for the plaintiff writing an interview request to defendant Warden Larry Jenkins complaining about Immel's verbal abuse toward the plaintiff. As a result of the retaliatory conduct reports, the plaintiff was transferred to a maximum security prison.

The complaint seeks compensatory and punitive damages.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S.

2

at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needless ness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . "); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable

3

inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

### 1. Parties

Plaintiff Michael Glover is an inmate in the custody of the Wisconsin Department of Corrections (DOC). He was incarcerated at Kettle Moraine Correctional Institution (KMCI) at all times relevant to this action.

Defendant Steven Hafermann is employed by the DOC as a supervising officer 2 at KMCI. His duties include the supervision of all correctional officers, correctional sergeants, and supervising officer 1's on an assigned shift. Hafermann also has responsibility for the overall direction and operation of an assigned shift as well as the responsibility for the supervision and treatment of inmates.

Defendant William McCreedy is employed by the DOC as the manager of the Health Services Unit (HSU) at KMCI. McCreedy's duties include management and supervision of health care services provided, developing procedures, monitoring care plans, preparing required reports, and providing liaison activities to other disciplines, institution units, and community health care providers. He works with the primary care physician,

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact and the Plaintiff's Proposed Findings of Fact. The facts are undisputed, unless otherwise indicated. Facts are included to the extent that they comply with Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein").

dentist, psychiatrist, and specialists serving as consultants to the Bureau of Health Services in a collaborative manner to provide quality health care at the assigned correctional facility in an efficient and effective manner. While the primary care physician and dentist are responsible for the professional management of medical and dental services, it is the health service manager who provides the overall administrative support and direction of the unit. This position also monitors nursing practice documentation in medical records, and has considerable latitude for independent action within established DOC/DAI/BHS standards, policies and procedures. McCreedy received a degree in nursing from the Evanston School of Nursing in 1983. As part of his duties as manager of the HSU, McCreedy is a custodian of the records of medical treatment for inmates incarcerated at KMCI, which are official regularly conducted business records of the HSU.

Defendant Matthew J. Frank is the Secretary of the DOC and has held this position since January 6, 2003. In that capacity, Frank has the responsibilities as generally defined by sec.15.04, Wis. Stats., and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code.

Defendant James Greer is employed by the DOC as the director of the Bureau of Health Services within the Division of Correctional Programs located in Madison, Wisconsin. Greer's past work experience includes twenty plus years of being employed as a senior manager in various health care facilities and thirty-one years experience as a registered nurse. Greer has a Master's degree as a clinical nurse specialist, a bachelor's

5

degree in nursing, and some bachelors degree in biology. Greer's responsibilities as director of the Bureau of Health Services include the development and implementation of policies for delivery of health services, preparing budgets, directing staff, and reviewing inmate complaints regarding the provision of health services at the correctional institutions.

Defendant Michael Dittmann has been employed with the DOC since November 4, 2002, as security director of KMCI. He has been employed by the State of Wisconsin since June 30, 1986. Under the general direction of the warden and deputy warden, Dittmann's duties as security director of KMCI include administration and supervision of the security program for the institution, as well as planning security program changes, directing the assignments of subordinate staff, and recommending security policy to the warden and deputy warden.

Defendant David Tarr is employed by the DOC as a supervising officer 2 at KMCI. Tarr's responsibilities include the supervision of all correctional officers, correctional sergeants, and supervising officer 1's on an assigned shift. Tarr also has responsibility for the overall direction and operation of an assigned shift as well as the responsibility for the supervision and treatment of inmates.

Defendant Timothy Immel is employed by the DOC as a correctional sergeant at KMCI. Immel's responsibilities include monitoring the various housing units and main lobby as necessary. Immel is also responsible for the general supervision of inmates.

6

Defendant Debra Palm is employed by the DOC as a nurse clinician 2 in the HSU at KMCI. Palm's duties include responsibilities of patient assessment and treatment, assisting the physician in providing medical services, management of medications, provision of emergency care, and maintenance of medical records.

Defendant Larry Jenkins is employed by the DOC as the warden of KMCI. Jenkins has held this position since December 26, 2004, and he has been employed with the State of Wisconsin since March 14, 1978. In his position as KMCI Warden, Jenkins has such duties as are set forth in the Wisconsin Statutes and the Wisconsin Administrative Code.

Defendant Hayley Pucker, formerly known as Hayley Hermann, is employed by the DOC as an inmate complaint examiner at KMCI. In this capacity, Pucker is the custodian of inmate complaints filed by inmates while incarcerated at KMCI. She also has access to records which are generated and/or maintained at the institution and which pertain to the inmates who are incarcerated at KMCI.

Defendant Scott Jaber is employed by the DOC as a correctional sergeant at KMCI. Jaber's responsibilities include monitoring the various housing units and main lobby as necessary. Jaber is also responsible for the general supervision of inmates.

**2. First Claim: Medical Care and Retaliation**

On October 26, 2004, the plaintiff signed a consent form for hepatitis-C treatment. The consent form states in part that "[t]reatment for hepatitis may have serious side effects, including but not limited to worsening of liver inflammation, anemia, allergic

7

reaction, heart attack, severe depression, suicide, pneumonia, loss of vision, or thyroid disease." (Glover Aff., Ex. C.)

The plaintiff was housed in the segregation unit at KMCI between December 27, 2004 and January 4, 2005. On December 29, 2004, the plaintiff spoke to a nurse and explained to her that he had experienced chest pain and shortness of breath. On January 4, 2005, the plaintiff was released from segregation and he wrote to defendant Nurse Palm stating that he was still experiencing chest pain. The plaintiff returned to segregation that same day and on January 5, 2005, Nurse Palm came to see him and stated that she would review the plaintiff's medical file and get back to him. Nurse Palm returned that same day and asked when the plaintiff was getting released from segregation. The plaintiff told her that he did not know and she told him he would be moving to a unit close to the HSU.

The plaintiff avers that Nurse Palm stated that he would be moving to the unit close to the HSU because he was at a higher risk of a heart attack due to the hepatitis-C treatment. Defendant Palm avers that she did not tell the plaintiff that he was at a higher risk of a heart attack.

On January 5, 2005, Nurse Palm filled out a Medical Restrictions/Special Needs form moving the plaintiff closer to the HSU. Nurse Palm avers that she did not provide the plaintiff with the Medical Restrictions/Special Needs form so that he could be reached in a timely fashion had a heart attack occurred.

8

On April 8, 2005, the plaintiff signed Offender Complaint KMCI-2005-12385, complaining about defendant Jaber:

> Staff Jaber unit 10 threaten me with a conduct report for talking in the day room area saying "he don't like noise."
> Staff Jaber needs to change his job to working with the mute's [sic] or at a cemetery and morgue because Michael Glover has the right to speak at will and rather Staff Jaber like it or not I'm gonna talk [sic].
> Every day Staff Jaber works on unit 10 he whine about something with me and I ain't doing nothing.
> This is a form of harassment.
> Please stop the harassment.

(Pucker Aff. ¶ 18, Ex. 102 at 1; Glover Aff. ¶ 10.)

On April 18, 2005, the plaintiff filed Offender Complaint KMCI-2005-12384 alleging that he was subjected to pat searches three times in one day and that during each pat search defendant Jaber kept grabbing his penis very roughly. The plaintiff was moved to a different unit pending an investigation regarding the plaintiff's allegations because Unit 7 had an available bed open. Pursuant to Executive Directive 16-A, the inmate and the staff member are to be separated and not have any contact while an investigation is being conducted.

The plaintiff submitted an Interview/Information Request dated April 18, 2005 stating that he had a medical restriction to be close to the HSU, but that staff had him moved to Unit 7 from Unit 10. Defendant Warden Jenkins forwarded this request to HSU Manager William McCreedy for review and follow up. As HSU Manager, McCreedy has the authority to determine whether a medical restriction/special needs form is medically necessary or

9

whether or not the restriction may be altered. The plaintiff was moved per security directive so as not to impede the investigation of the plaintiff's claims against defendant Jaber. Based upon defendant McCreedy's professional judgment and expertise, and to a reasonable degree of medical certainty, there was no reason that the plaintiff needed to be housed close to the HSU.

Defendant Pucker interviewed the plaintiff on April 19, 2005, regarding his allegations in Offender Complaint KMCI-2005-12384. Pucker explained to the plaintiff that Administrative Directive 11.6 was to be followed based on the allegations in his offender complaint. The plaintiff refused to provide more details and also refused to sign a statement. Pursuant to Administrative Directive 11.6, if the inmate refuses the interview or to provide or sign a statement the complaint shall be dismissed for failure to cooperate. Therefore, on April 19, 2005, Pucker recommended that this complaint be dismissed. On April 19, 2005, Jenkins dismissed Offender Complaint KMCI-2005-12384 with modification. Pursuant to DOC 310.16, Jenkins waived confidentiality so all allegations in the complaint could be investigated as outlined in Executive Directive 16-A.

On April 25, 2005, the plaintiff filed Offender Complaints KMCI-2005-13203 and KMCI-2005-13051 alleging that a Medical Restriction/Special Needs form placing him in a unit closer to the HSU was ignored and that staff had no right to override the Medical Restriction/Special Needs. Pucker investigated these allegations and found that, because the plaintiff had made allegations against a staff member in Unit 10, the inmate needed to be

10

moved away from that unit pending an investigation into the allegations. Pucker noted that the plaintiff was moved to Unit 7 because there was a bed open on that unit. Pucker found that defendant Hafermann noted the Medical Restriction/Special Needs form so he contacted the HSU to check that it would be okay to move the inmate to Unit 7 if the inmate was provided with rides to the HSU. Defendant McCreedy reviewed the plaintiff's medical file and found no reason that he needed to be housed close to the HSU. Upon information provided to Hafermann by HSU staff, there was no reason that the plaintiff needed to be housed close to the HSU so he was moved to Unit 7 pending investigation of the plaintiff's allegations against Jaber.

The ICE Report from Offender Complaint KMCI-2005-13051 states in relevant part:

> The inmate complains that HSU will not uphold its order that he is to be housed in a unit close to HSU because of a security issue regarding a complaint that he filed regarding a staff member in Unit 10.
>
> This investigator contacted B. McCreedy, Health Services Manager, on 04-25-05. Mr. McCreedy informed this ICE that review of his medical records indicates he started Hep -C treatment October 2004. He was placed in a unit closer to HSU on 1/05/05 for unknown reasons. Nurse who wrote order and MC contacted cannot recall why. No note in medical record on or about that time. He is required to come to HSU only once per week for treatment. He has no other medical reason to be housed close to HSU. Patient had a c/o about a security staff member in the complex he was housed in so he needed to be moved by security. Capt. Hafermann checked with HSU staff prior to move and received approval to move him to another complex. On 4/20/05 Mr. Glover was called to HSU due to the

11

fact he sent his Ribavirin back to HSU stating he was not going to take it any more until he was moved back closer to HSU. He stated to the nurse he "was done with this institution and being jerked around". It was explained to him there was no medical reason why he needed to be closer to HSU and record reviewed to show him he was only coming to HSU one time per week. He understood this and stated he was "getting even with security" for moving him. He was told security did contact HSU prior to his move to get approval. Patient still refused to take his medication. He was told that his medication was available if he changed his mind. He was referred to Clinical staff to f/u.

It is apparent the inmate has been attended to by KMCI medical staff based on evidence stated in the medical chart on file. This investigator is not qualified to question the health services staff and their evaluation of the inmate's medical needs. These types of decisions must be left to the medical professionals.

Recommendation is therefore being made to dismiss this complaint.

(Pucker Aff. ¶ 16, Ex. 103 at 3.) Based on Pucker's findings as stated in the ICE Report, on

May 10, 2005 Offender Complaint KMCI-2005-13051 was dismissed.

The ICE Report from Offender Complaint KMCI-2005-13203 states in relevant

part:

The inmate complains that on 04-18-05 Capt. Hafermann ignored his note from HSU that stated that he was to be housed close to HSU and moved him to Unit 7. The inmate claims that no staff has the right to override a decision made by HSU. The inmate also notes that as a result of this move, he has stop[ed] taking his Hepatitis C treatment.

This investigator notes that because of some allegations that the inmate made regarding a staff member in Unit 10, the inmate needed to be moved away from that unit, and since there was a bed in Unit 7, the inmate was moved to that unit. Capt.

12

Hafermann noted that the inmate did have a notice from HSU that he was to be housed close to HSU, so he contacted them to check that if the inmate was given rides, would it be okay to move the inmate to Unit 7, and they agreed.

This investigator also notes that the inmate wrote an interview the Warden [sic] about being moved against medical orders, and this was referred to Mr. McCreedy, HSU Manager. Mr. McCreedy reviewed the inmate's medical file and found no reason that the inmate actually needed to be housed close to HSU besides a note from the doctor, and that note was written after the inmate stated that he would not take the Hepatitis treatment unless he was close to HSU. Mr. McCreedy noted that the inmate only has to report to HSU once a week for this treatment, and there is nothing else physically wrong with him that would make it difficult for him to walk from any unit in the institution to HSU.

This investigator also notes that the inmate was contacted by Mr. McCreedy, HSU Manager, to speak with him about the stopping of his medication, and to attempt to explain the whole situation.

(Pucker Aff. ¶ 16, Ex. 104 at 4.) On May 4, 2005, Pucker recommended that Offender Complaint KMCI-2005-13203 be dismissed. Based upon Pucker's findings, Warden Jenkins dismissed Offender Complaint KMCI-2005-13203 on May 11, 2005.

Defendant Nurse Palm had no personal involvement in the decision by security staff to move the plaintiff from Unit 10 to Unit 7. Nurse Palm did not participate in the issuance of Conduct Report #1737444 to the plaintiff, nor did she participate in the administrative proceedings on this conduct report.

Defendant HSU Manager McCreedy provided the plaintiff with appropriate medical care and did not deny him medical care that resulted in further injury or infliction

13

of pain. At all times during his incarceration at KMCI, McCreedy addressed the plaintiff's medical needs based upon his knowledge, experience and expertise. McCreedy did not participate in issuance of Adult Conduct Report #1737444 to the plaintiff; nor did he participate in the administrative proceedings on this conduct report.

Defendant Pucker was never personally involved in any decisions concerning any treatment plans, programs, or other decisions related to the plaintiff. Pucker had no personal involvement with the medical care given to the plaintiff. Pucker did not participate in the decision to place the plaintiff on Unit 10. Pucker did not participate in the decision to move the plaintiff from Unit 10 to Unit 7. Pucker did not participate in issuance of Conduct Report #1737444 to the plaintiff, nor did she participate in the administrative proceedings on this conduct report. Pucker did not conspire with, order, or encourage any person to issue and process the above-discussed conduct report.

Although defendant Warden Jenkins has general supervisory authority over KMCI operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day medical decisions of medical personnel at the various departments within KMCI. Jenkins does not and is not qualified to provide medical services to inmates at KMCI. Such diagnostic and treatment services are provided to inmates by the KMCI HSU. The DOC's Bureau of Correctional Health Services provides oversight for medical for inmates in the DOC. Jenkins exercises no control over or input into HSU staff medical diagnostic and treatment decisions. Jenkins exercises no day-to-day control over HSU decisions in

14

calendaring appointments or prescribing medication for inmates with medical staff. Jenkins was never personally involved in any decisions concerning any treatment plans, programs, or other decisions related to the plaintiff. Jenkins had no personal involvement with the medical care given to the plaintiff. Jenkins did not participate in the decision to place the plaintiff on Unit 10. Jenkins did not participate in the decision to move the plaintiff from Unit 10 to Unit 7.

Defendant Hafermann did not participate in issuance of Adult Conduct Report #1737444 to the plaintiff. He did not participate in the administrative proceedings on this conduct report.

Defendant Greer had no knowledge of, nor was he ever personally involved in, any decisions concerning any treatment plans, programs, or any other decisions related to the plaintiff. Greer had no personal involvement with the medical care given to the plaintiff. Greer had no personal involvement in the housing or transfer decisions with regard to the plaintiff at KMCI. Greer had no personal involvement in the allegations indicated in the complaint in this action.

Although defendant Secretary Frank has general supervisory authority over DOC operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day operations of individual DOC institutions or employees. Frank does not and is not qualified to provided medical services to inmates at KMCI. Such diagnostic and treatment services are provided to inmates by the KMCI HSU. Frank exercises no day-to-day supervisory

control over HSU employees; nor does he have any control over or input on their diagnostic and treatment decisions. Frank exercises no day-to-day control over HSU decisions in calendaring appointments or prescribing medications for inmates with medical staff. Frank had no knowledge of, nor was he ever personally involved in, any decisions concerning any treatment plans, programs, or any other decisions related to the plaintiff. Frank had no personal involvement with the medical care given to the plaintiff. Frank had no personal involvement with the housing or transfer decisions with regard to the plaintiff at KMCI. At no time did Frank violate any constitutional rights afforded to the plaintiff. Frank had no personal involvement in the allegations indicated in the complaint in this action.

**2. Second Claim: Retaliation**

The plaintiff submitted an Interview/Information Request dated April 19, 2005, to the warden's office alleging that defendant Immel called him a disrespectful name as the plaintiff was on his way to file an offender complaint with defendant Pucker (f/k/a Hermann). The plaintiff submitted another Interview/Information Request to the warden's office dated April 21, 2005, alleging that while he was going to the HSU, Immel stated that he didn't "like [Glover's] kind." The plaintiff felt that the statement was racist. On April 22, 2005, these Interview/Information Request forms were forwarded to defendant Dittmann for review and follow up. Dittmann appointed defendant Tarr to investigate the allegations.

Tarr interviewed the plaintiff on April 26, 2005. The plaintiff stated that on April 19, 2005, Immel stated that he had a pass to see defendant Pucker and did not

16

understand where he was being sent. Immel explained it was to see the inmate complaint examiner in the Administration Building. The plaintiff stated in the interview that he received his pass and while walking away Immel muttered, "You do know where that is asshole." The plaintiff explained to Tarr that on April 21, 2005, Immel had stated "Mr. Glover I really don't like your kind" following a conversation about him bringing trash out of his room to throw away in the day room. The plaintiff stated to Tarr that he did not know of any witnesses to either incident and that he did not think anyone else heard either statement due to the tone and level of the communication.

Tarr also interviewed Immel concerning the allegations. Immel stated that he never made either of the statements at any time, to or in the presence of the plaintiff.

On April 28, 2005, Tarr wrote the plaintiff up in Conduct Report 1737444 for violation of DOC rule 303.271, lying about staff. Tarr was motivated in writing the conduct report by his duty to write such reports under Wis. Admin. Code DOC 303.64 - DOC 303.66. Pursuant to these administrative rules, Tarr must write a conduct report, such as Conduct Report 1737444, when, on the basis of his observation and other information he obtains, Tarr concludes that an inmate has violated one or more of the prison disciplinary rules, §§ DOC 303.12 - DOC 303.63.

Defendant Tarr avers that after discussion with the plaintiff, the plaintiff admitted to Tarr that he came to the conclusion that Immel's statement was a racist statement due to his own prejudice and nothing Immel had said. The plaintiff disputes this and avers

17

that in order to support writing Conduct Report Number 1737444, defendant Tarr lied and said that the plaintiff admitted that Immel had never said racist remarks to him.

On April 29, 2005, Dittmann reviewed Conduct Report 1737444 and decided that the conduct report should proceed as a major offense because the alleged violation created a risk of serious disruption at the institution or in the community. On May 3, 2005, the hearing officer found the plaintiff guilty of violating DOC rule 303.271 and gave him a disposition of 4 days Adjustment Segregation and 180 days of Disciplinary Segregation.

On April 27, 2005, defendant Immel observed the plaintiff walk out of the bathroom without a shirt on. Immel then ordered the plaintiff to put a shirt on. The plaintiff stated he needed soap and toothpaste. Immel informed him that when he put a shirt on, he could get some. The plaintiff then stated loudly, "I just got out of the shower." Immel explained to him that he needed to wear a shirt when going to and from the shower. Immel again ordered the plaintiff to put a shirt on. The plaintiff then went back into the bathroom. This incident was witnessed by Sergeant Christopher Bruden.

Some couple minutes later, the plaintiff walked through the unit while brushing his teeth. Immel informed the plaintiff that personal hygiene should be done in the bathroom or in his room and not in the day room. The plaintiff then stated something that Immel could not understand. Immel gave the plaintiff a direct order to remove the toothbrush from his mouth. The plaintiff removed the toothbrush from his mouth and then shouted "I am not in the day room." He then continued to brush his teeth as he walked to the bathroom. A few

18

minutes later, Immel heard a loud voice in the bathroom. Immel looked in and observed the plaintiff standing in the bathroom talking loudly to two other inmates. Immel entered the bathroom and told the plaintiff that he was too loud, to stop loitering, and to stop visiting in the bathroom. The plaintiff then shouted "it's personal, I know it's personal." Immel directed the plaintiff to step in the office. He refused. The plaintiff then walked to the inmate complaint examiner box. Immel ordered him to stop, go to his room, and get some socks on. He refused and grabbed some inmate complaint forms. Immel again ordered the plaintiff to step into the office. He then complied. Immel explained to him that he had to wear socks any time he is out of his room after 6:00 a.m. The plaintiff then yelled, "I'm coming from the shower." Immel again explained to him that he was walking to the inmate complaint examiner's box and he needed to wear socks. The plaintiff then shouted "it's going to be a long day." Immel then informed the plaintiff that he needed to comply with the rules, follow orders, and stop being disruptive. Immel told him he was receiving a conduct report for disobeying orders and being disruptive. The plaintiff yelled "I didn't disobey no orders. I wasn't disruptive." Immel stated to the plaintiff that, if he continued to be disruptive, Immel would contact a supervisor and request he be removed from the unit. The plaintiff then yelled "write what you got to write, and I'll write what I got to write." Immel then ordered the plaintiff to his room, and contacted a supervisor.

As the plaintiff walked to his room, he continued to shout in the hallway. Immel ordered him to stop, but the plaintiff ignored him. The plaintiff came back out of his

19

room and again started to shout to other inmates in the hallway. Immel again ordered the plaintiff to go to his room and to stay there. The plaintiff then yelled, "I can't eat?" Immel explained to him that he was given an order. The plaintiff then yelled, "I can't get water?" Immel repeated that he was given an order to stay in his room. He then yelled, "I can't use the bathroom. I have a medical condition. You can't stop me from using the bathroom. I have to go to the bathroom." Immel informed the plaintiff that if he disobeyed orders he would have to face the consequences. The plaintiff then went to his room.

On April 27, 2005, Immel wrote the plaintiff up in Conduct Report 1737644 for violation of DOC rules 303.24, disobeying orders and 303.28, disruptive conduct. Immel was motivated in writing the conduct report by his duty to write such reports under Wis. Admin. Code DOC 303.64 - DOC 303.66. Pursuant to these administrative rules, Immel must write a conduct report, such as Conduct Report 1737644, when, on the basis of his observation and other information he obtains, Immel concludes that an inmate has violated one or more of the prison disciplinary rules, §§ DOC 303.12 - DOC 303.63.

According to the plaintiff, this "entire episode was either grossly exaggerated or entirely fabricated so that Immel could retaliate against the plaintiff for writing complaints against him." (Pl.'s Resp. to Defs.' Proposed Findings of Fact ¶¶ 135-57, 162, 165-67.)

On April 28, 2005, Dittmann reviewed Conduct Report 1737644 and decided that the conduct report should proceed as a major offense because the alleged violation created a risk of serious disruption at the institution or in the community. On May 3, 2005,

20

the hearing officer found the plaintiff guilty of violating DOC rules 303.24 and 303.28 and gave him a disposition of 2 days Adjustment Segregation.

The plaintiff disputes Dittmann's motivation for approving the conduct reports. He avers that approved the conduct reports in order to retaliate against the plaintiff for filing lawsuits against staff.

## 4. Exhaustion

In order to exhaust an inmate's administrative remedies, he must comply with the requirements of Wisconsin Administrative Code § DOC 310. Pucker diligently searched the regularly conducted business records of her office with respect to inmate complaints filed by the plaintiff during the period of January 2005 to June 2005. As a result of her search, Pucker found that the only inmate complaints that were filed by the plaintiff during this period that concerned the claims asserted by the plaintiff were the following: KMCI-2005-12384, KMCI-2005-12385, KMCI-2005-13051, KMCI-2005-13203, KMCI-2005-13901, KMCI-2005-13902, KMCI-2005-14677 and KMCI-2005-14678. According to the defendants, of these eight complaints, the five complaints that did not comply with the requirements of Wis. Admin. Code § DOC 310 were KMCI-2005-12385, KMCI-2005-13901, KMCI-2005-13902, KMCI-2005-14677 and KMCI-2005-14678.

KMCI-2005-12385 was filed on April 18, 2005. Pucker rejected KMCI-2005-12385 on April 26, 2005, as moot pursuant to Wisconsin Administrative Code § DOC 310.11(5)(f) because the plaintiff had been transferred to Unit 7 and was no longer subject

21

to Unit 10 rules or staff actions. The plaintiff did not appeal the decision to the reviewing authority. KMCI-2005-13901 was filed on May 3, 2005. Pucker recommended dismissal of KMCI-2005-13901 on May 19, 2005 and Warden Jenkins dismissed the complaint on May 24, 2005. The plaintiff did not appeal the decision to the corrections complaint examiner. KMCI-2005-13902 was filed on May 3, 2005. Pucker rejected KMCI-2005-13902 on May 19, 2005, pursuant to Wisconsin Administrative Code § DOC 310.08(2)(a) because the plaintiff was challenging the factual basis of a conduct report which is outside the scope of the inmate complaint review system. The plaintiff did not appeal the decision to the reviewing authority. KMCI-2005-14677 was filed on May 9, 2005. Pucker recommended dismissal of KMCI-2005-14677 on May 9, 2005, and Warden Jenkins dismissed the complaint on May 10, 2005. The plaintiff did not appeal the decision to the corrections complaint examiner. KMCI-2005-14678 was filed on May 9, 2005. Pucker rejected KMCI-2005-14678 on May 9, 2005 pursuant to Wisconsin Administrative Code § DOC 310.08(2)(a) because the plaintiff was challenging the factual basis of a conduct report which is outside the scope of the inmate complaint review system. The plaintiff did not appeal the decision to the reviewing authority.

The defendants aver that in the three complaints that complied with the requirements of Wis. Admin. Code § DOC 310, the plaintiff did not complain or raise any issues of retaliation by William McCreedy, Matthew J. Frank, James Greer, Michael Dittmann, David Tarr, Timothy Immel, Dr. Elsa Horn, Debra Palm, Larry Jenkins, Hayley

22

Pucker (Hermann), or Scott Jaber. The defendants also aver that in the three complaints that complied with the requirements of Wis. Admin. Code § DOC 310, inmate Glover did not complain or raise any issues of deliberate indifference to a serious medical need by Matthew J. Frank, James Greer, Michael Dittmann, David Tarr, Timothy Immel, Dr. Elsa Horn, Debra Palm, Larry Jenkins, Hayley Pucker (Hermann) or Scott Jaber. The defendants further aver that in the three complaints that complied with the requirements of Wis. Admin. Code § DOC 310, inmate Glover did not complain or raise any issues about the conduct of Matthew J. Frank, James Greer, Michael Dittmann, David Tarr, Timothy Immel, Dr. Elsa Horn, Debra Palm, Larry Jenkins, or Hayley Pucker (Hermann).

## ANALYSIS

The defendants contend that, 1) the plaintiff has not stated claims against defendants McCreedy, Frank, Greer, Dittmann, Horn, Palm, Jenkins, Hermann, or Jaber; 2) the plaintiff has failed to exhaust his administrative remedies; 3) the defendants are entitled to summary judgment on the plaintiff's claim that he was moved from Unit 7 in violation of a medical order; and 4) the defendants are entitled to summary judgment on the plaintiff's retaliation claim.

The plaintiff contends that, 1) he has stated claims against defendants Jaber, Pucker, McCreedy, Horn, Palm, Dittmann, and Jenkins; 2) he has exhausted his administrative remedies; and 3) he did have a serious medical need.

23

## 1. Defendants Frank and Greer

The plaintiff does not dispute the defendants' contention that he does not state a claim against defendants Frank and Greer. It is undisputed that these defendants were not involved in either of the plaintiff's claims. Accordingly, they will be dismissed.

## 1. Exhaustion of administrative remedies

The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S.Ct. 2378, 2384, 2387 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules

24

require"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the DOC has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner within fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) & 310.09(6). Complaints submitted later than fourteen days after the event may be accepted for good cause. Wis. Admin. Code § DOC 310.09(6). After reviewing and acknowledging each complaint in writing, the inmate complaint examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) & 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of the recommendation. Wis. Admin. Code § DOC 310.12. Within ten days after the date of

25

the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner. Wis. Admin. Code § DOC 310.13(1). The corrections complaint examiner reviews the appeal and makes a recommendation to the Secretary of the DOC. Wis. Admin. Code § DOC 310.13(6). The Secretary may accept, adopt, or reject the corrections complaint examiner's recommendation, or return the appeal to the corrections complaint examiner for further investigation. Wis. Admin. Code § DOC 310.14(2).

## A. Plaintiff's First Claim

The defendants contend that the plaintiff "never filed a complaint that complied with the requirements of Wis. Admin. Code § DOC 310 that raised any allegations of deliberate indifference to a serious medical need against any defendant except Captain Hafermann." (Defs.' Br. in Support of Mot. for Summ. J. at 14.) A purpose of the exhaustion requirement is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *see Smith v. Zachary*, 255 F.3d 446, 450-51 (7th Cir. 2001). To provide officials with sufficient notice, inmates must file grievances at the place and time and with the information required by the prison's administrative rules. *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Where the administrative rules are silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* at 650; *see Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

26

The PLRA does not require that a defendant be named in an inmate's administrative grievance. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007). Prison grievance procedures, not the PLRA, determine the level of specificity required in an inmate's administrative grievance:

> Compliance with the prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Id.* Drawing on principles of notice pleading, the Court of Appeals for the Seventh Circuit has held that, absent more stringent administrative requirements, an inmate need not state "facts, legal theories, or demand relief," so long as the grievance objects "intelligibly to some asserted shortcoming." *Strong*, 297 F.3d at 650; *see Riccardo*, 375 F.3d at 524.

With respect to the level of detail in an offender complaint, the DOC administrative rules require that offender complaints "[c]ontain only one issue per complaint, and shall clearly identify the issue." Wis. Admin. Code § DOC 310.09(1)(e). The administrative rules do not require that a prison official be named in the offender complaint. Thus, the standard is whether the offender complaint would put an official on notice of the plaintiff's claim.

The plaintiff filed eight offender complaints relevant to the claims in this action. Four of these offender complaints, KMCI-2005-12384, KMCI-2005-12385, KMCI-2005-13051, and KMCI-2005-13203, pertain to the plaintiff's first claim. It is undisputed

27

that KMCI-2005-12384, KMCI-2005-13051, and KMCI-2005-13203 were fully exhausted. In KMCI-2005-12384, the plaintiff complained that defendant Jaber roughly grabbed his penis three times. (Pucker Aff. ¶ 16, Ex. 101.) In KMCI-2005-13051, the plaintiff complained that "H.S.U. Medical staff compromize [sic] my medical restriction dated 1-5-05 regarding my Hepatitis-C treatment to please KMCI staff Haferman." (Pucker Aff. ¶ 16, Ex. 103.) The plaintiff also complained that the unit transfer occurred because of the complaint he wrote against defendant Jaber. *Id.* In KMCI-2005-13203, the plaintiff complained that defendant Hafermann failed to honor his medical restriction to be housed in a unit close to the HSU as a form of retaliation and harassment. (Pucker Aff. ¶ 16, Ex. 104.)

The plaintiff's offender complaints were more than sufficient to put the defendants on notice of his first claim. The plaintiff has exhausted his administrative remedies as to this claim.

**B. Plaintiff's Second Claim**

The defendants contend that the plaintiff never filed an inmate complaint that complied with the requirements of Wis. Admin. Code § DOC 310 that complained of or raised an issue of retaliation by any of the defendants in this lawsuit. Offender complaints KMCI-2005-13901, KMCI-2005-13902, KMCI-2005-14677, and KMCI-2005-14678, pertain to the plaintiff's second claim.

Offender Complaint KMCI-2005-13901, in which the plaintiff complained that defendant Immel made a racist statement towards him, and KMCI-2005-14677, in which the

28

plaintiff complained that defendant Immel used vulgar language towards him, were both

dismissed by the inmate complaint examiner because those matters were already being

investigated. (Pucker Aff. ¶ 16, Exs. 105 and 107.) It is undisputed that the plaintiff did not

file an appeal to the corrections complaint examiner on either of these offender complaints.

However, the plaintiff contends that Offender Complaints KMCI-2005-13901 and KMCI-

2005-14677 were "fully exhausted through alternate means." (Pl.'s Br. in Resp. to Defs.'

Mot. for Summ. J. at 6.) The plaintiff explains:

> In addition to filing the above complaints, the plaintiff
> submitted interview request slips to Jenkins on 4-19, and 4-21-
> 05, complaining that Immel had made these racist and
> disrespectful remarks to him. Even though the plaintiff filed
> ICI's at the same time, the warden ordered Dittmann to follow
> up on the allegations. Dittmann then ordered Tarr to investigate,
> and because this process was under way Jenkins dismissed the
> two ICI's. Essentially the warden chose to handle the
> allegations against Immel by initiating a formal investigation
> rather than go through the ICI process under DOC 310. The
> plaintiff cannot now be restricted from proceeding on these
> claims because they were exhausted by alternative means that
> were selected by the person who dismissed the complaints and
> who also used said alternative means as justification for the
> dismissal.

*Id.* at 7. It is undisputed that the ICE Reports for these offender complaints indicate that,

"[b]ased on the fact that Capt. Tarr was assigned to investigate the inmate's allegations

already, recommendation is being made to dismiss this complaint" (KMCI-2005-13901), and

"[s]ince this issue has already been investigated, this investigator sees no need to duplicate

29

an investigation and recommendation is being made to dismiss this complaint" (KMCI-2005-14677). *Id.*

In order to exhaust under the ICRS, the plaintiff was required to appeal dismissals of his inmate complaint to the corrections complaint examiner and it is undisputed that he did not do this with respect to Offender Complaints KMCI-2005-13901 and KMCI-2005-14677. However, there still remains the question whether the plaintiff reasonably believed that he had done all that was necessary to comply with the exhaustion requirement. Inmates may rely on the assurances of prison officials when they are led to believe that satisfactory steps have been taken to exhaust administrative remedies. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). In *Curtis*, the defendant jail guards argued that the plaintiff inmate had failed to exhaust his administrative remedies because he hand-delivered a grievance to a jail employee instead of placing it in a lockbox designated for that purpose. In overturning the grant of summary judgment for the defendants, the court observed that the defendants had offered no evidence to dispute the inmate's testimony that hand-delivery was an encouraged alternative to use of the lockbox. The court explained that prison officials who "encourage, or even invite, noncompliance with written procedure" cannot then turn around and use the deviation as evidence of a failure to exhaust. *Id.*

In addition, Offender Complaints KMCI-2005-13902, in which the plaintiff complained about both statements by Immel, and KMCI-2005-14678, in which the plaintiff complained about the statements by Immel and subsequent alleged retaliation based on him

30

complaining about Immel, were both rejected as outside the scope of the ICRS. It is undisputed that the plaintiff failed to appeal the rejection of these offender complaints. *See* DOC § 310.11(6) (an inmate may appeal a rejected complaint within 10 calendar days only to the appropriate reviewing authority who shall only review the basis for the rejection of the complaint). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S.Ct. 2378, 2382 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir.2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Accordingly, the plaintiff did not exhaust his administrative remedies with respect to Offender Complaints KMCI-2005-13902 and KMCI-2005-14678.

In sum, it is not clear that the plaintiff did not exhaust Offender Complaints KMCI-2005-13901 and KMCI-2005-14677. Where the record establishes disputed issues of fact on the question of exhaustion of administrative remedies, the defendants' burden has not been met. *See Curtis*, 436 F.3d at 711-12. Thus, these grievances will not be dismissed for failure to exhaust. However, it is clear that the plaintiff failed to exhaust with respect to Offender Complaints KMCI-2005-13902 and KMCI-2005-14678. Thus, he may not proceed on claims based on these offender complaints.

In any event, the plaintiff's second claim consists of allegations of ongoing, interrelated retaliation. Portions of the allegations making up the claim have been exhausted

31

and other portions have not. It is not feasible to dismiss for failure to exhaust portions of this claim. Thus, the court will consider the merits of the entire claim.

## 2. Eighth Amendment Claim

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez*, 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez*, 111 F.3d at 1371.

32

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman*, 241 F.3d at 845 (citing Farmer, 511 U.S. at 840-42).

The defendants contend that the plaintiff did not have a serious medical need related to this lawsuit, that none of the defendants had actual knowledge of his alleged serious medical need, and that the defendants did not disregard the plaintiff's medical needs. The plaintiff contends that he did have a serious medical need and that the defendants were deliberately indifferent to that need.

The defendants maintain that the alleged serious medical need relevant to this lawsuit is whether the plaintiff was "at a higher risk of a heart attack." (Defs.' Br. at 16.) They conclude that the plaintiff did not have a serious medical need because he did not have a heart attack. However, it is undisputed that the plaintiff suffered from hepatitis C and that he took medication for that condition. Also, it is undisputed that one of the potential side effects of his medication was a heart attack. Hepatitis C, not risk of a heart attack, is the relevant medical condition. Under the relevant case law, hepatitis C qualifies as a serious

33

medical need.  *See Zentmyer*, 220 F.3d at 810 (medical condition diagnosed by a physician as needing treatment is objectively serious); *Moore v. Duffy*, 225 F.3d 543, 545 (8th Cir. 2001) (noting that defendant doctor conceded that hepatitis C is a serious medical condition).

Having determined that the plaintiff did have a serious medical need, the court turns to whether the defendants were deliberately indifferent to his medical need.  The parties dispute why the plaintiff, in the first place, was moved to a unit close to the HSU.  The plaintiff avers that defendant Nurse Palm told him that he was moving to Unit 10 because he was at a higher risk of a heart attack because of his hepatitis C medication.  Defendant Palm avers that she did not tell the plaintiff that he was at a higher risk of a heart attack.

In any event, it is undisputed that approximately three months after being transferred to Unit 10, the plaintiff filed two offender complaints against defendant Jaber.  On April 18, 2005, after filing the second complaint, the plaintiff was transferred to Unit 7 pending investigation into the plaintiff's allegations.  On that same day, the plaintiff filed an Information/Interview Request stating that he had a medical restriction to be close to the HSU.  Defendant Warden Jenkins forwarded the request to defendant HSU Manager McCreedy.  Defendant McCreedy, who has the authority to determine whether a medical restriction form is medically necessary or whether the restriction may be altered, found that, based on his professional judgment and expertise, and to a reasonable degree of medical certainty, there was no reason that the plaintiff needed to be housed close to the HSU.

34

Non-medical prison officials cannot be held "deliberately indifferent" simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by a prison doctor. *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (citations omitted). In *Johnson*, 433 F.3d at 1010, the court found that a prison's grievance counselor, a prison official responsible for investigating inmates' grievances, was not deliberately indifferent because the actions he took did not amount to a disregard of the inmate's complaints. The grievance counselor "investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions." *Id.* Thus, the court concluded, the grievance counselor was "insulated from liability because he 'responded reasonably' to [the prisoner's] complaint." *Id.* at 1011 (citations omitted). The court went on quote with approval the Third Circuit's recent analysis of the issue of non-medical prison officials' liability in Eighth Amendment medical care cases:

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prison was under a physicians' care would strain this division of labor . . . . Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-

35

medical prison official . . . will not be chargeable
with the Eighth Amendment scienter requirement
of deliberate indifference.

*Id.* at 1011 n.9.

In the context of medical professionals, "it is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference." *Johnson*, 433 F.3d at 1012-13 (citing *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999)). Dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *Johnson*, 433 F.3d at 1013 (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). For instance, it is not enough to show that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent. *Johnson*, 433 F.3d at 1013 (citation omitted).

However, "a trier of fact can conclude that the professional knew of the need from evidence that the serious medical need was obvious." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment – the leg is broken, so it must be set; the person is not breathing, so CPR must be administered – a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983"). In addition, a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment. *See Collignon*,

163 F.3d at 989 ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); *Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

In this case, the two medical professionals involved in this claim are defendants Horn and McCreedy. Defendant Horn signed the medical restriction form transferring the plaintiff to Unit 10. Later, after it was determined that the plaintiff should be moved from Unit 10 for security reasons, McCreedy reviewed the plaintiff's medical file and found no reason that he needed to be housed close to the HSU. This information was reported to defendant Hafermann and the plaintiff's transfer to Unit was approved.

The plaintiff did not agree with the transfer. However, disagreement with medical professional about treatment needs does not state a cognizable Eighth Amendment claim. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). The record does not support a finding that any defendant was deliberately indifferent to the plaintiff's serious medical need.

37

### 3. Retaliation Claims

A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right may be liable to the prisoner for damages. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996). Otherwise, lawful action "taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir.2000). Although it is easy to state a retaliation claim, *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir.2002) (petitioner need not allege a chronology of events from which retaliation could be plausibly inferred), the burden of proving the claim is heavy, *Babcock*, 102 F.3d at 275.

To prevail on a retaliation claim, a prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in a defendant's actions. *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005-06 (7th Cir.2005); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir.2004). "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of--in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hasan*, 400 F.3d at 1006. "Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant ... to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct." *Spiegla*, 371 F.3d at 943.

38

In this case, the plaintiff has presented no evidence to show that any defendant retaliated against him. In short, the plaintiff has not carried his burden with regard to any retaliation claim. Conclusory averments that he was retaliated against do not withstand summary judgment. "It is well-settled that conclusory allegations ... without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir.2002) (citing *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 [7th Cir.1998] ). Therefore, the defendants' motion for summary judgment on the plaintiff's retaliation claims will be granted.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #46) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 22nd day of February, 2007.

**SO ORDERED,**

s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**

39